[Cite as *Rorick's, Inc. v. Corporex Dev. & Constr. Mgt., L.L.C.*, 2017-Ohio-8694.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| RORICK'S INC. | : | JUDGES: |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| CORPOREX DEVELOPMENT & | : | |
| CONSTRUCTION MANAGEMENT, LLC | : | Case No. 2017CA00075 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:              Appeal from the Court of Common
                                     Pleas, Case No. 2016CV02670




JUDGMENT:                            Reversed and Remanded




DATE OF JUDGMENT:                    November 20, 2017




APPEARANCES:

For Plaintiff-Appellee                  For Defendant-Appellant

OWEN J. RARRIC                          MARK L. RODIO
TERRY A. MOORE                          200 Public Square
ALETHA M. CARVER                        Suite 3000
4775 Munson Street                      Cleveland, OH  44114
Canton, OH  44735-6963

*Wise, Earle, J.*

{¶ 1} Defendant-Appellant, Corporex Development & Construction Management, LLC, (Corporex), appeals the May 3, 2017 judgment entry of the Stark County Court of Common Pleas denying Corporex's motion to stay pending arbitration. Plaintiff-appellee is Rorick's Inc.

FACTS AND PROCEDURAL HISTORY

{¶ 2} In April 2014, CPX Canton Airport, LLC (Owner) contracted with Corporex for the construction of an Embassy Suites Hotel in North Canton (the Project). Corporex then entered into a contract (Prime Contract) with Bennett Construction Management (BCM) to serve as the Prime Contractor to manage and direct the project.

{¶ 3} A year later, in April 2015, BCM awarded all of the drywall work on the project - floors one through six - and acoustic ceiling tiles to Rorick's Inc. (Rorick's). Rick Rorick is the president of Rorick's, Inc. BCM presented Rorick with a Subcontractor Agreement (Subcontract) on April 24, 2015. Rorick refused to sign the document because he objected to the arbitration provision. The initial amount discussed between BCM and Rorick for completion of Rorick's scope of work was $1,153,000.

{¶ 4} The Subcontract included "the attached Standard Conditions dated June 1, 1999." However, the Standard Conditions attached to the Subcontract were actually dated November 1, 2013.

{¶ 5} Despite never signing a contract, Rorick's began its scope of work on the Project immediately. Rorick submitted one pay application to BCM for work completed through April 2015 for $130,950 and received payment for the same. He submitted other pay applications to BCM for work completed in May, June, and July for more than

$300,000, but by the end of July had not been paid. These pay applications included charges for work completed by Rorick's on the tower floors of the project. This work was beyond that originally contemplated between BCM and Rorick's. These change orders expanded Rorick's scope of work and added $186,130 to the original stated cost.

{¶ 6} During the course of the Project, there were significant disputes between BCM and Corporex due to BCM's mismanagement of the Project. On July 21, 2015, Rorick's received a letter from Corporex advising it that BCM had abandoned the project. Corporex then assumed some of BCM's duties and hired Summit Construction to assume BCM's project management obligations.

{¶ 7} Corporex, through Michael O'Donnell, asked Rorick's to stay on the job, but requested a copy of Rorick's signed Subcontract, invoices, and any change orders that Rorick's entered into with BCM before BCM abandoned the Project. According to Rorick, O'Donnell assured him he would be paid for the outstanding amounts owed by BCM and that his scope of work would not change.

{¶ 8} On August 10, 2015, Rorick received a draft Assignment and Assumption Agreement (Assignment) from Corporex. Again, Rorick refused to sign the document. This time however, Rorick did not object to the arbitration provisions, but rather because of a rumor he had heard that Corporex was going to hire someone else to complete the drywall and acoustic ceiling tiles on the first floor, thus narrowing Rorick's original scope of work.

{¶ 9} The same day, Rorick's attached a proposed addendum to the Assignment. The addendum at paragraph 9 would have prohibited Corporex from narrowing Rorick's scope of work. The addendum did not, however, make any mention of dispute resolution.

Rorick did not discuss the arbitration provisions referenced in the Assignment with anyone from Corporex, but did consult his counsel and believed he was not subject to the arbitration provisions of the Subcontract.

{¶ 10} On August 11, 2015, Corporex rejected paragraph 9 of Rorick's addendum, and further requested Rorick's to submit documentation to support its claim that additional monies were owed for work on the tower floors of the Project.

{¶ 11} Rorick's submitted a second proposed addendum on August 13, 2015, deleting the prohibition on narrowing its scope of work and instead offering additional workers for completion of the first floor work. The same day, Corporex responded and asked Rorick's to provide three additional pieces of information – cost, time to completion, and how many of the additional workers would be "hangers," i.e, workers hanging drywall as opposed to performing finishing work.

{¶ 12} The next day, Rorick's responded that the drywall installation would take twice as long as normal due to conditions on the Project, but provided no actual time frame. By August 20, 2015, after some back and forth, Rorick's still had not provided Corporex the answers it sought. Corporex thus removed the first floor from the scope of Rorick's work and notified Rorick's in writing of the same on August 21, 2015. Corporex presented Rorick's with a written change order removing the first floor work from Rorick's scope of work. Rorick's refused to sign the change order and responded that the removal of the first floor work was a breach of its Subcontract with BCM.

{¶ 13} Meanwhile, Rorick's still had not been paid for May, June, July, and August, was unable to make payroll, and was further concerned about possible bankruptcy.

Rorick's had expected payment at the beginning of August based on O'Donnell's oral assurances that it would be paid the amount owed Rorick's by BCM.

{¶ 14} Corporex advised, however, that before Rorick's could be paid, the Assignment must be signed. On August 26, 2015, Rorick chose to sign the Assignment. Rorick's made some changes to the document, none of which concerned dispute resolution. The Assignment incorporated the previously unsigned Subcontract and the Prime contract to the extent applicable to Rorick's scope of work on the Project.

{¶ 15} Thereafter, Corporex released overdue payments to Rorick's.

{¶ 16} On January 28, 2016 Rorick's requested mediation in an attempt to resolve its disputes with Corporex over reduction in its scope of work and monies owed. Mediation was conducted in May 2016 and was unsuccessful.

{¶ 17} On December 8, 2016, Rorick's filed a complaint against Corporex alleging fraudulent inducement, breach of contract, violation of the prompt pay act, promissory estoppel, unjust enrichment, and defamation. Rorick's claimed damages exceeding $100,000. On January 13, 2017, Corporex filed an answer and a motion to stay pending arbitration. Rorick's filed a memorandum in opposition.

{¶ 18} An evidentiary hearing was held March 2, and 6, 2017 on Corporex's motion to stay and Rorick's fraudulent inducement argument. Following the hearing, Rorick's and Corporex each filed proposed findings of fact and conclusions of law.

{¶ 19} On May 3, 2017, the trial court issued its opinion denying Corporex's motion. Corporex then filed this appeal. Corporex presents two assignments of error:

I

{¶ 20} "THE TRIAL COURT ERRED IN DENYING DEFENDANT-APPELLANT CORPOREX DEVELOPMENT & CONSTRUCTION MANAGEMENT, LLC'S ("CORPOREX") MOTION TO STAY PENDING ARBITRATION ("MOTION") AND IN FINDING THAT PLAINTIFF-APPELLEE RORICK'S INC. ("RORICK'S") DID NOT AGREE TO ARBITRATE DISPUTES IN EXCESS OF $1000,000 BASED ON INCORRECT LEGAL CONCLUSIONS."

II

{¶ 21} "THE TRIAL COURT'S DENIAL OF THE MOTION BASED ON INCORRECT FACTUAL FINDINGS WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I

{¶ 22} In its first assignment of error, Corporex argues the trial court erred in denying its motion to stay pending arbitration, and further erred in finding Rorick's did not agree to arbitrate disputes in excess of $100,000 due to incorrect legal conclusions.

Standard of Review

{¶ 23} The parties disagree on our standard of review in this matter. The standard of review on a trial court's ruling on a motion to stay pending arbitration hinges on "the type of questions raised challenging the applicability of the arbitration provision." *Kaminsky v. New Horizons Computer Learning Ctr. of Cleveland*, 8th Dist. Cuyahoga No. 97261, 2016-Ohio-1468, 62 N.E.3d 1054 ¶ 12. As we noted in *Simmons v. Extendicare Heath Services, Inc., et al,* 5th Dist. Delaware No. 15 CAE 12 0095, 2016-Ohio-4831 ¶ 13:

In general, an appellate court reviews a trial court's decision to grant or deny a motion to compel arbitration or stay the proceedings under the abuse of discretion standard of review. *Primmer v. Healthcare Industries Corp.*, 2015-Ohio-4104, 43, 43 N.E.3d 788 N.E.3d 788, ¶ 8 (4th Dist.); *Scott v. Kindred Transitional Care & Rehab.*, 8th Dist. Cuyahoga No. 103256, 2016-Ohio-495, ¶ 4. However, the issue of whether a controversy is arbitrable under an arbitration provision of a contract is a question of law for the court to decide; therefore, the standard of review on those issues is de novo. *Church v. Fleishour Homes, Inc.,* 172 Ohio App.3d 205, 874 N.E.2d 795, 172 Ohio App.3d 205, ¶ 9 (5th Dist.2007). When the validity of an arbitration agreement is in question, the determination involves a mixed question of law and fact. *Scott v. Kindred Transitional Care & Rehab.*, 2016-Ohio-495, ¶ 4 citing *Corl v. Thomas & King*, 10th Dist. Franklin No. 05AP–1128, 2006-Ohio-2956, ¶ 10.

{¶ 24} The question here is whether the controversy between the parties is subject to arbitration pursuant to their contract. We therefore review this matter de novo. Under de novo review, an appellate court may interpret the language of the contract and substitute its interpretation for that of the trial court. *Children's Medical Center v. Ward*, 87 Ohio App.3d 504, 622 N.E.2d 692 (2nd Dist.1993).

Applicable Law

{¶ 25} The Supreme Court of Ohio has recognized Ohio's public policy favoring arbitration. *Taylor Bldg. Corp. of America v. Benfield*, 117 Ohio St.3d 352, 884 N.E.2d 12 (2008).  This public policy stance is codified in R.C. 2711.02(B) which provides:

> (B) If any action is brought upon any issue referable to arbitration under an agreement in writing for arbitration, the court in which the action is pending, upon being satisfied that the issue involved in the action is referable to arbitration under an agreement in writing for arbitration, shall on application of one of the parties stay the trial of the action until the arbitration of the issue has been had in accordance with the agreement, provided the applicant for the stay is not in default in proceeding with arbitration.

{¶ 26} Despite the presumption favoring arbitration, however, a party cannot be compelled to arbitrate a dispute in which they have not agreed to submit to arbitration. *Council of Smaller Ents. v. Gates, McDonald & Co.*, 80 Ohio St.3d 661, 687 N.E.2d 1352 (1998).

{¶ 27}  A contract is to be interpreted to give effect to the intention of the parties. *Morrison v. Petro Evaluation Serv., Inc.*, 5th Dist. Morrow No. 2004-CA-0004, 2005-Ohio-5640, ¶ 29 citing *Employer's Liab. Assur. Corp. v. Roehm,* 99 Ohio St. 343, 124 N.E. 223 (1919), syllabus. "Generally, courts presume that the intent of the parties to a contract resided in the language they chose to employ in the agreement." *Shifrin v. Forest City*

*Ents. Inc.*, 64 Ohio St.3d 635, 638, 597 N.E.2d 499 (1992). "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus.

Relevant Contract Provisions

{¶ 28}  Rorick's signed the Assignment and Assumption Agreement on August 26, 2015. In doing so, Rorick's agreed to the Subcontract it had previously refused to sign as well as the standard terms and conditions attached to the Subcontract.

{¶ 29} The first page of the Subcontract identifies which documents comprise the Subcontract. It reads as follows:

> The Contractor and Subcontractor agree as follows:
>
> The Subcontract Documents consist of this Subcontract including the Standard Conditions dated June 1, 1999, and plans and specifications. The Subcontract represents the entire agreement between the parties hereto and it may be amended only by written Modification.
>
> The Subcontractor shall provide all labor, materials, tools and equipment to construct in a thorough and workmanlike manner complete in every respect, the following scope of work. This scope includes, but is not necessarily limited to the following specific items:

1. Subcontractor shall be responsible for Contract terms per attached Exhibit 1 (owners [Prime] contract),

2. Plans and specs as listed in Exhibit 1,

3. Scope of work listed as "drywall" scope for "Embassy Suites – Canton, OH.

{¶ 30} Paragraph 7 of the Standard Conditions addresses dispute resolution. It provides for unlimited arbitration. Specifically, paragraph 7 of the Standard Conditions states:

Any claim related to this Subcontract shall be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes in mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association. Claims not resolved by mediation shall be decided by arbitration in accordance with the Construction Industry Rules of the American Arbitration Association. Demand for arbitration shall be filed in writing with the other party to this Subcontract and with the American Arbitration Association. The decision of the arbitrator shall be final, and the judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

{¶ 31} Article 12 of the Prime Contract between Corporex and BCM states:

In the event of any dispute arising hereunder, * * * both Corporex and Prime Contractor will use their best efforts to settle such dispute or disagreement in good faith and in a manner that is fair and equitable to both Parties before either party can exercise the right of legal action. If the Parties cannot mutually reach a resolution within thirty (30) days * * * then * * * to the extent the amount in controversy is in excess of $100,000, in the aggregate, the Parties shall retain and may avail themselves of any and all of their respective cumulative rights and remedies * * * Notwithstanding any of the forgoing, Prime Contractor shall continue with the completion of the Work during any period of arbitration and Corporex shall remain obligated to pay for such services as herein provided.

{¶ 32} Paragraph 2 of the Assignment states:

You agree that the [Subcontract] includes all of the terms and conditions of the [Prime Contract] between [BCM] and Corporex relating to the Project to the extent applicable to your Project work under the [Subcontract], and you agree to assume towards Corporex directly all of the duties and responsibilities that Bennet, in turn, assumed towards Corporex relative to your scope of work including, without limitation, any warranty obligations, project close-out

obligations, and compliance of the work with Project plans and specifications and applicable law.

{¶ 33} Paragraph 4 of the Standard Conditions contemplates changes in the scope of work. It states:

The subcontractor may be ordered in writing by the contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract, the Subcontract sum, and the Subcontract time being adjusted accordingly. The Subcontractor, prior to the commencement of such change Work shall submit to the Contractor written copies of a modification to the Subcontract Documents. No extra work or changes under this contract will be recognized unless by the Contractor and paid for by the Owner and unless agreed to in writing before the work is done or the changes are made.

{¶ 34} Article 8 of the Prime Contract addresses how the Prime Contractor and Corporex shall handle changes in work and the procedure required if they are unable to agree. The relevant portions state:

8.1 Changes in Work Including reduction in scope or quality of material, Prime Contractor Compensation or Project Schedule may

only be effectuated by execution of a written Change Order. A Change Order is a written instrument signed by the Prime Contractor and Corporex, * * * stating their agreement upon a change in the Work, the GMP, Prime Contractor Compensation and/or the Project Schedule. Any request for a Change Order(s) from Prime Contractor shall be accompanied by all Subcontractor documentation required by Corporex. The amount to be paid to Subcontractor or Design Professionals, or adjustment to General Conditions, if any, shall be negotiated for each change.

8.2 In the event Prime Contractor and Corporex cannot agree to a Change Order relating to a change in the Work, Corporex shall have the right, if it elects to order Prime Contractor to proceed with the change in the Work and the terms of the accompanying Change Order will be resolved in accordance with the terms of Article 12.

## Arguments

{¶ 35} Corporex argues paragraph 7 of the Standard Conditions applies to dispute resolution in this matter. Rorick's responds that because its case involves the reduction of its scope of work on the Project, the arbitration provisions in Article 12 of the Prime Contract apply, and further, since this dispute involves more than $100,000, it is not subject to arbitration and is instead entitled to a jury trial.

Analysis

{¶ 36} Here, the trial court found the matter was not referable to arbitration because the Prime contract rather that the Subcontract governed arbitration between the parties. We disagree.

{¶ 37} The Assignment is the only document signed by Rorick's. That document does not contain an arbitration clause. Instead, the competing arbitration clauses at issue here are contained within Article 12 of the Prime Contract which is the limited arbitration clause, and paragraph 7 of the Standard Conditions to the Subcontract, which is the unlimited arbitration clause. The Assignment incorporated all of the Standard Conditions and those portions of the Prime Contract relating to Rorik's scope of work on the Project.

{¶ 38} The Subcontract indicates that the Subcontract, Standard Conditions, and plans and specifications represent "the entire agreement between the parties." Paragraph 7 of the Standard Conditions contains a broad, plainly worded arbitration provision; "*Any* claim related to this Subcontract shall be subject to arbitration." (Emphasis added.)

{¶ 39} Article 12 of the Prime Contract plainly sets forth the parties covered by that article – "Corporex and Prime Contractor." As Corporex notes, and the record reflects, Rorick's never signed the Prime Contract and was never the Prime Contractor. Article 12 does not reference the Subcontractor. The Prime Contractor was BCM. Article 12 applies by its plain language therefore, to disputes between BCM and Corporex. By signing the Assumption agreement, Rorick's agreed to the substitution of Corporex for BCM. Rorick's did not, as it argues, replace BCM in the Prime Contract.

{¶ 40} Rorick's also argues, and the trial court found, that the language of item 1 of the Subcontract, contained in paragraph 29 above – "Subcontractor shall be responsible for contract terms per attached Exhibit 1 [Prime Contract]" incorporates all the terms of Prime contract. Yet paragraph 2 of the Assignment agreement signed by Rorick's states it includes the terms and conditions of the Prime Contract only "to the extent applicable to [Rorick's] Project work under the [Subcontract]." It further required Rorick's "assume towards Corporex directly all of the duties and responsibilities that [BCM], in turn, assumed towards Corporex *relative to your scope of work* including, without limitation, any warranty obligations, project close-out obligations, and compliance of the work with Project plans and specifications and applicable law." (Emphasis added.) The trial court found this language broad enough to incorporate general contract terms of the Prime contract, including those applicable to arbitration.

{¶ 41} Neither Corporex nor Rorick's provide us with any further commentary on what "scope of work" means or includes, but the above passage appears self-explanatory, encompassing manner and character of work – those things involved in Rorick's specific piece of the project.

{¶ 42} According to Rorick's, because its scope of work was narrowed by subtraction of the first floor work on the Project, and because Corporex allegedly conceded it changed Rorick's scope of work pursuant to Article 8 of the Prime contract, the arbitration clause of the Prime contract applies. We disagree.

{¶ 43} First, to interpret the language of item 1 of the Subcontract, and paragraph 2 of the Assignment to mean that the entire Prime contract applies to Rorick's creates a manifest absurdity. It would mean that Rorick's would also be bound by dozens of other

obligations contained in the 43-page Prime Contract such as obtaining building permits, handling labor disputes and so on.

{¶ 44} Second, there is a provision in both the Subcontract and the Prime Contract governing changes in scope of work. Paragraph 4 of the Standard Conditions addresses how the prime contractor and the subcontractor shall handle change orders, while Article 8 of the Prime contract addresses how the Prime Contractor and Corporex shall handle change orders. By its plain language, Article 8 applies to the handling of change orders between Corporex and the Prime Contractor, BCM. As we have already stated above, Rorick's never became the Prime Contractor. Further, contrary to the trial court's finding and Rorick's argument here, the record does not support a finding that Corporex conceded at the hearing that Article 8 applied to this dispute. Instead, as Corporex points out, Article 8 was referenced to demonstrate that scope of work could change for both the Prime Contractor through Article 8 and the Subcontractor through Paragraph 4 of the Standard Conditions. March 6, 2017 T. at 126. In other words, everyone's scope of work was subject to change. Indeed, Rorick's scope of work was at one point expanded to include work on the tower floors of the Project.

{¶ 45} Finally, as to the date discrepancy on the Standard Conditions, O'Donnell, testifying for Corporex at the hearing, indicated this was a typographical error. March 6, 2017 T. at 127. Further, Rorick's, a sophisticated company negotiating a million-dollar contract, signed the Assignment and Assumption Agreement indicating its agreement with the Standard Terms and Conditions attached to that document and thereby, the arbitration clause contained therein. Rorick's was obviously aware of the arbitration

agreement, yet never challenged the matter with Corporex and chose to sign the Assignment rather than take other action to obtain payment.

{¶ 46} Because Rorick's is not a party to the Prime Contract and was never the prime contractor, and because Article 12 of the Prime Contract specifically names who that provision applies to – Corporex and BCM, we find Article 12 inapplicable to the dispute between Rorick's and Corporex. Paragraph 7 of the Subcontract governs disputes between Corporex and Rorick's and as such, the matter is subject to arbitration regardless of the amount in controversy.

II

{¶ 47} Based on our resolution of the first assignment of error, we find Corporex's second assignment of error moot.

By Wise, Earle, J.

Delaney, P.J. and

Hoffman, J. concur.


EEW/sg 106